FILED
COURT OF APPEALS
DIVISION II

2013 DEC 20 AM 8: 35

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 41970-0-II |
| Respondent/Cross Appellant, | |
| v. | |
| ODIES DELANDUS WALKER, | PUBLISHED IN PART OPINION |
| Appellant/Cross Respondent. | |

PENOYAR, J. — A jury convicted Odies Walker of first degree murder, first degree assault, first degree robbery, solicitation, and conspiracy for his role in the murder and robbery of an armored truck driver inside a Walmart. Walker appeals his convictions, arguing that the "to convict" premeditated murder instruction violated his due process rights because it allowed the jury to convict him as an accomplice without proving that the principal committed all of the elements of the crime. Because accomplice liability law allows a jury to convict participants without unanimously determining which participants satisfied which elements of the crime, we hold that the jury instructions were not erroneous.

In the unpublished portion of the opinion, we address Walker's additional arguments that (1) the prosecutor committed numerous instances of misconduct and (2) his trial counsel was ineffective for failing to request a cautionary instruction on accomplice testimony and for failing to object to the prosecutor's misconduct. We also consider Walker's statement of additional grounds (SAG) arguing that the trial court erred by denying his motion for a CrR 3.6 hearing. We hold that none of the alleged prosecutorial misconduct committed requires reversal, counsel

was not ineffective, and the trial court correctly denied Walker's CrR 3.6 motion because the items to be suppressed were within the scope of a valid search warrant.[1] We affirm.

FACTS

I.   BACKGROUND

In June 2009, Calvin Finley and Marshawn Turpin killed and robbed an armored truck driver inside the Lakewood Walmart. Finley shot and killed Kurt Husted, a Loomis armored truck driver who was picking up the store's daily earnings. The bullet went through Husted and struck a bystander, injuring the bystander's shoulder. Turpin grabbed the bag of money on Husted's cart, and he and Finley fled the store to a white Buick waiting in the parking lot. A witness later identified Walker, who is Finley's cousin, as the driver of the Buick, and police recovered Walker's fingerprint on the driver's side seatbelt.

Police were able to trace the Buick because a witness had memorized a partial license plate number. The Buick was registered to Sartara Williams, the mother of Finley's child. At Finley's request, Williams falsely reported the vehicle stolen in April and gave Finley the keys. The Buick was parked behind Walker's house under a tarp for a few months, until the robbery in June. After the robbery, the police found the Buick in an alley behind Finley's friend's house. Neighbors had seen Finley, Walker, and another man in the area that same afternoon. One of the men was carrying a bag behind his back.

About 30 minutes after the robbery, Walker returned to Walmart to pick up Turpin's car. He then went home, where his girl friend, Tonie Williams-Irby, found him watching the news when she returned from work.

---

[1] The State cross appeals, arguing that the trial court erred when it included language in the aggravating circumstances instruction that is only applicable in death penalty cases. Because we do not remand, we do not reach this issue on appeal.

2

Walker and Williams-Irby picked their children up from school, then Walker drove to the alley where the Buick was parked, telling Williams-Irby that he needed to wipe fingerprints off the car. The Buick was surrounded by police when they arrived, so Walker kept driving.

Walker next drove his family to Al Trevino's house. On the way, Walker told Williams-Irby that he was in the Buick and on the phone with Finley during the robbery. When Finley asked the guard for the money, the guard laughed, so Walker told Finley to "kill the mother fucker." 8 Report of Proceedings (RP) at 729.

Finley and Turpin were at Trevino's when Walker and Walker's family arrived. Walker, Finley, and Turpin went into Trevino's bathroom and changed clothes. They put their clothes and a Loomis bag into a black plastic bag. Walker then put two $10,000 bundles of cash in Williams-Irby's purse and gave her $2,500 in cash to pay bills. Walker also threatened Trevino, telling him that it was "on [his] life and [his] family" if he said anything. 10 RP at 1143.

Trevino, Finley, and Turpin left Trevino's house together. Trevino drove them down near the river, where he saw Finley run in the direction of the river with the black plastic bag. Finley did not have the bag with him when he returned to the vehicle. Trevino then drove Finley to a motel.

Walker left Trevino's house with his family and drove to the Federal Way Walmart where he purchased two safes and a Nintendo Wii with cash. Walker gave one safe to Finley and put the other in the master bedroom closet at Walker's house. Walker put the $20,000 in cash into the closet safe. Williams-Irby put the cash Walker had given her for bills in an envelope that she placed in her dresser drawer. Walker then took his family out to dinner, where he paid with cash. While at dinner, he told Williams-Irby's son, "[T]his is how you do it. This is how you murder these niggers and get this money." 8 RP at 773.

3

On his way back from the restaurant, Walker was stopped by the police, who had received a tip that he was involved in the robbery and murder. The police arrested Walker and Williams-Irby. They obtained a search warrant for Walker's house. They found a safe in the master bedroom closet containing $20,000, an envelope containing $900 in the dresser, and ammunition for a 9 mm handgun—the same type of weapon used to shoot the guard—in the closet.

During questioning, Walker denied any involvement in the robbery. He admitted that he had seen the armored truck arrive at Walmart many times while he was waiting to pick up Williams-Irby, a manager at Walmart, from her shift. He also admitted that he had been at Walmart after the robbery to pick up Turpin's car.

The police arrested Finley the next day in Trevino's wife's car. The police searched the trunk of the car and discovered a safe containing $21,830 in cash.

II.     TRIAL

The State charged Walker as an accomplice with (1) aggravated first degree premeditated murder, (2) first degree felony murder further aggravated by a high degree of planning and a destructive and foreseeable impact on persons other than the victim, (3) first degree assault, (4) first degree robbery, (5) first degree solicitation to commit robbery, and (6) first degree conspiracy to commit robbery. The State also sought deadly weapon enhancements for the murder, assault, and robbery charges.

At trial, Williams-Irby, Darrell Parrott, Jessie Lewis, and Jordan Lopez all testified that they heard Walker planning to rob the armored truck at Walmart months before June 2009. Walker had attempted to recruit both Parrott and Lewis for the robbery. In May, Walker asked Parrott to be back up for Finley, telling Parrott that he would have to carry a gun. Parrott

refused. Around the same time, Walker told Lewis about his plan. He told Lewis that Lewis's job would be to shoot the guard and that he, Walker, would be the getaway driver. Walker then drove Lewis and Finley to Walmart to show them how the plan would work. Walker knew the timing of the armored truck's arrival and how many guards went into the store each time. Walker offered both Finley and Lewis guns; Finley took a gun but Lewis refused. Finley and Lewis entered the store after the guard. Lewis left the store before the guard retrieved the money because he was nervous about the plan and "knew that someone was going to get killed." 9 RP at 912. Although Walker did not try to recruit her, Lopez twice overheard Walker discussing his plans to rob Walmart with Lewis and Finley.

Williams-Irby also overheard Walker discussing his plans to rob Walmart on numerous occasions. In February 2009, Walker started asking Williams-Irby, who sometimes attended Walmart staff meetings where the previous day's earnings were announced, how much money the armored truck picked up each day. Walker mentioned that he thought the armored truck would be "easy money." 7 RP at 656. In March, Williams-Irby heard Walker yelling at Finley and someone named Jonathan about the plan to rob Walmart. Walker was angry that it was taking so long and was worried that Jonathan would make a mistake. He told the others that they would all go to jail if there was a mistake and that he would get the most time because he planned it. In April, she heard Walker discussing the robbery with Finley and Turpin. She heard Walker say that he would be the getaway driver because he was a better driver than the others and he would be recognized if he entered the store, where he used to work as a greeter. She also heard Walker and Finley discussing killing the armored truck guard. Walker told Finley to "do what you got to do" and then he offered Finley a 9 mm handgun. 7 RP at 665. On the morning of the robbery, Williams-Irby called Walker to report Walmart's earnings for the previous day.

5

Walker attempted to challenge Williams-Irby's credibility on cross examination, pointing out that she had initially told the police that neither she nor Walker was involved in the robbery and that she had entered a plea deal with the State. Walker repeatedly asked Williams-Irby if she had told the State what it wanted to hear. Williams-Irby consistently replied that she knew the State wanted the truth. She also said "My desire is to tell the truth and get closure for Mr. Husted's family." 8 RP at 822. Walker asked, "The truth is determined by [the prosecutor] isn't it?" 8 RP at 815. Williams-Irby replied that "[t]he truth is determined by what happened" and that she was "telling the truth whether [the prosecutor] want[s] to hear it or not." 8 RP at 815, 818.

The jury found Walker guilty as charged. The jury also found that the State had proven all of the alleged aggravating circumstances and that Walker or an accomplice was armed with a firearm during the murder, assault, and robbery. The trial court sentenced Walker to life plus 303 months.[2] Walker appeals his convictions. The State cross appeals, arguing that the trial court erred in its jury instructions.

## ANALYSIS

### PREMEDITATION JURY INSTRUCTIONS

First, Walker argues that the trial court's premeditation instructions violated his due process rights because (1) they relieved the State of its burden of proving the charged crime and (2) they violated his right to a unanimous verdict. Specifically, he asserts that the trial court's premeditation instructions were erroneous because, under the first degree murder and accomplice liability statutes, the State had to prove that Finley, the shooter, had premeditated intent to kill the guard and, here, the instructions allowed the jury to find Walker guilty if it found either he *or*

---

[2] The trial court merged the two murder convictions for sentencing.

6

Finley had premeditated intent to kill the guard. We hold that the trial court's instructions properly stated accomplice liability law.

We review jury instructions de novo. *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006). Jury instructions are sufficient if, when read as a whole, they accurately state the law, are not misleading, and permit each party to argue its theory of the case. *State v. Clausing*, 147 Wn.2d 620, 626, 56 P.3d 550 (2002).

Under the first degree premeditated murder statute, the State must prove that the defendant, with premeditated intent, caused the death of another person. RCW 9A.32.030(1)(a). A person may be liable for the acts of another if he acts as an accomplice. RCW 9A.08.020. A person is an accomplice if, with knowledge that it will promote or facilitate the commission of a crime, he solicits, commands, encourages, or requests another person to commit the crime or aids or agrees to aid another in planning or committing the crime. RCW 9A.08.020(3)(a).

The trial court gave the following instructions regarding premeditation: "A person commits the crime of premeditated murder in the first degree, as charged in Count I, when, with a premeditated intent to cause the death of another person, he or an accomplice causes the death of another person." CP at 213.

> To convict the defendant of the crime of premeditated murder in the first degree, count I, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about 2nd day of June, 2009, the defendant or an accomplice acted with intent to cause the death of Kurt Husted;
> (2) That the intent to cause the death was premeditated . . . .

CP at 216. Neither party objected to these instructions at trial.

Division One of this court has upheld similar jury instructions involving accomplice liability. In *State v. Haack*, the State charged the defendant with first degree assault after he and

his brother both attacked the victim. 88 Wn. App. 423, 429-30, 958 P.2d 1001 (1997). The trial court instructed the jury that, to convict the defendant, it must find that "the defendant or an accomplice assaulted [the victim]" and that "the defendant or an accomplice acted with intent to inflict great bodily harm." *Haack*, 88 Wn. App. at 427 (emphasis omitted). The defendant argued that this instruction allowed the jury to convict by splitting the elements of the crime between himself and his brother. *Haack*, 88 Wn. App. at 427. Division One agreed but held that the instructions were not an incorrect statement of accomplice liability law. *Haack*, 88 Wn. App. at 427. The court stated that the jury could convict all of the participants in a first degree assault if the State proved that a life-threatening injury was caused by one of the participants and that at least one of the participants intended to inflict life-threatening harm; the State did not have to prove which participant actually inflicted the injury. *Haack*, 88 Wn. App. at 428; *see also State v. Hoffman*, 116 Wn.2d 51, 84-85, 104, 804 P.2d 577 (1991) (affirming defendants' first degree murder convictions even though instructions allowed the jury to convict if they found either defendant had premeditated the shooting; the jury did not have to unanimously agree which defendant was the accomplice or principal).

Walker attempts to distinguish *Haack*, but his argument is not persuasive. He argues that in *Haack*, there was evidence that the principal both had the necessary intent and actually committed the assault, whereas here, the evidence proved that Finley was the shooter and Walker had premeditated intent. This distinction is inapposite for two reasons. First, there is evidence from which the jury could find that Finley also had premeditated intent. Several witnesses testified that they overheard Walker and Finley discussing the robbery, including the fact that someone would shoot the guard. Williams-Irby heard Walker tell Finley "do what you got to do" in regards to killing the guard. 7 RP at 665. Walker provided Finley with a loaded gun that

8

Finley carried into Walmart both the time that he entered with Lewis and did not attempt the robbery and the day of the murder. *See State v. Ra*, 144 Wn. App. 688, 703, 175 P.3d 609 (2008) (listing the planned presence of a weapon at the scene of the crime as one circumstance supporting premeditation).

Second, even if the jury did "split the elements of the crime" between Finley and Walker, this was not an error under accomplice liability law. Appellant's Br. at 48. The jury needs only to conclude unanimously that both the principal and the accomplice participated in the crime; it does not need to unanimously conclude as to the manner of their participation. *Hoffman*, 116 Wn.2d at 104. Therefore, as the *Haack* court stated, the jury could convict all participants of a crime, even the lookout, as long as the State proved that at least one participant committed the criminal act and one participant—not necessarily the same one—possessed the required intent. 88 Wn. App. at 429. Nor does it matter that the evidence clearly showed that Finley, not Walker, performed the actual shooting.

> The legislature has said that anyone who participates in the commission of a crime is guilty of the crime and should be charged as a principal, regardless of the degree or nature of his participation. Whether he holds the gun, holds the victim, keeps a lookout, stands by ready to help the assailant, or aids in some other way, he is a participant. The elements of the crime remain the same.

*State v. Carothers*, 84 Wn.2d 256, 264, 525 P.2d 731 (1974), *overruled on other grounds by State v. Harris*, 102 Wn.2d 148, 685 P.2d 584 (1984).

The trial court's instructions were correct statements of accomplice liability law and did not deny Walker his due process. There was no need for a unanimity instruction where accomplice liability allows a jury to convict as long as it finds that the elements of the crime were met, regardless of which participant fulfilled them.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

I.   PROSECUTORIAL MISCONDUCT

Next, Walker argues that prosecutorial misconduct denied him a fair trial. We disagree. He points to several instances during opening and closing arguments where the prosecutor allegedly made prejudicial statements. Although some of the statements were improper, none of them affected the outcome of the trial.

A.   Standard of Review

A defendant who alleges prosecutorial misconduct bears the burden of proving that, in the context of the record and circumstances of the trial, the prosecutor's conduct was both improper and prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). A defendant establishes prejudice by showing a substantial likelihood that the misconduct affected the jury verdict. *Thorgerson*, 172 Wn.2d at 443. Where the defendant fails to object to the prosecutor's improper statements at trial, such failure constitutes a waiver unless the prosecutor's statement is "'so flagrant and ill-intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by a curative instruction to the jury.'" *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003) (quoting *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997)).

In determining whether the misconduct warrants reversal, we consider its prejudicial nature and cumulative effect. *State v. Boehning*, 127 Wn. App. 511, 518, 111 P.3d 899 (2005). We review a prosecutor's remarks during closing argument in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions.

10

*Dhaliwal*, 150 Wn.2d at 578. It is not misconduct to argue that the evidence fails to support the defense's theory, and the prosecutor is entitled to make a fair response to the defense's arguments. *State v. Russell*, 125 Wn.2d 24, 87, 882 P.2d 747 (1994).

B.    Opening Statement

First, Walker argues that the prosecutor committed misconduct by calling Walker a liar during opening statements. But the prosecutor was stating what the evidence was expected to show—that Walker lied to police. This conduct is distinguishable from situations where the prosecutor improperly opined about the defendant's veracity; the prosecutor's comments here were not misconduct.

In his opening statement, the prosecutor said

> When the police question the defendant, he is being—he is adamant. He is cursing. He is yelling. He is swearing. He is saying he didn't have any idea why the police stopped him. Why did you arrest me? I didn't do anything. I had nothing to do with it. My wife, Williams-Irby, she didn't have anything to do with this. He is lying like crazy to the police. Williams-Irby pled guilty to second degree murder, and she will tell you what she had to do with it. He told the cops he didn't have anything to do with it.

Supp. RP at 48. Walker did not object to this comment at trial.

The prosecutor may not give his personal opinion about the credibility of a witness. *State v. Copeland*, 130 Wn.2d 244, 290, 922 P.2d 1304 (1996). But during an opening statement, the prosecutor may state what the State's evidence is expected to show. *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008).

Walker argues that this remark is similar to the prosecutor's remark in *State v. Reed*, 102 Wn.2d 140, 145-46, 684 P.2d 699 (1984). In *Reed*, another first degree murder case, the Supreme Court held that the prosecutor committed reversible misconduct when he called the defendant a liar four times, stated that the defense did not have a case and that the defendant was

11

clearly guilty, and implied that defense witnesses were untrustworthy because they were from out of town. 102 Wn.2d at 145-46. The defendant objected to all of these comments at trial. *Reed*, 102 Wn.2d at 144. The court held that these comments were improper and that they prejudiced the defendant, focusing on the prosecutor's attacks on the defense witnesses. *Reed*, 102 Wn.2d at 147. The court also noted that the State's evidence was not overwhelming, contributing to the likelihood that the comments affected the jury's decision. *Reed*, 102 Wn.2d at 147.

Here, the prosecutor's remark was not misconduct. The prosecutor stated what the State's evidence was expected to show. The State's evidence, including Williams-Irby's testimony, was expected to show that Walker was involved in the robbery and murder and that he lied to the police when he said he was not. Further, this case is distinguishable from *Reed*. Unlike the defendant in *Reed*, Walker did not object to the prosecutor's arguments. Therefore, Walker must meet a higher standard to show error—flagrant and ill intentioned misconduct— than the defendant in *Reed*. And, in *Reed*, the prosecutor baldly asserted that the defendant was a liar, telling the jury that the defendant "couldn't tell the truth under torture." 102 Wn.2d at 143. Here, the prosecutor was stating what the State's evidence was expected to show.

Even assuming the prosecutor's statement was misconduct, there is not a substantial likelihood that it affected the jury's verdict. The statement attacked Walker's credibility, but his credibility was not an issue at trial. Walker did not testify, and his argument was that the State's evidence was only circumstantial and its witnesses were not credible. Therefore, any statements about Walker's own credibility would not have affected the jury's verdict.

C.     PowerPoint

Next, Walker argues that the prosecutor committed misconduct by expressing a personal opinion of Walker's guilt through a PowerPoint presentation during closing arguments. Under *In re Personal Restraint of Glasmann*, 175 Wn.2d 696, 286 P.3d 673 (2012), it was improper for the State to opine about Walker's guilt, but, given the facts of this case, this misconduct did not affect the outcome of the trial.

The State's closing argument presentation included several slides with text imposed over pictures of Walker. The second slide of the presentation is Walker's booking photo with the words "SHOOT THE MOTHER FUCKER" imposed over it. Ex. 243, at 1. Toward the end of the presentation, the prosecutor included two other booking photos, one with "GUILTY BEYOND A REASONABLE DOUBT" imposed on it and one with "we are going to beat this" imposed on it. Ex. 243, at 87, 89. The presentation also includes a picture of Walker and his family out at dinner with "THIS IS HOW YOU MURDER AND ROB NIGGERS NEXT TIME IT WILL BE MORE MONEY" written under it, and a picture of cash on a table with "MONEY IS MORE IMPORTANT THAN HUMAN LIFE" imposed on it. Ex. 243, at 5, 89. Additionally, about half of the slides have the heading "DEFENDANT WALKER GUILTY OF PREMEDITATED MURDER." Ex. 243, at 6.

In *Glasmann*, the Supreme Court reversed the defendant's convictions after the prosecutor improperly presented the jury with multiple copies of the defendant's bloody booking photograph with text questioning the defendant's veracity and stating that the defendant was "GUILTY, GUILTY, GUILTY." 175 Wn.2d at 706. The Court determined that the multiple altered photographs were improper because the prosecutor's modification of the photographs was the equivalent of submitting unadmitted evidence to the jury. *Glasmann*, 175 Wn.2d at 706.

13

Although the booking photograph had been admitted into evidence, the prosecutor had modified the photograph by adding text asking "DO YOU BELIEVE HIM?" and "WHY SHOULD YOU BELIEVE ANYTHING HE SAYS ABOUT THE ASSAULT?" and proclaiming that the defendant was "GUILTY." *Glasmann*, 175 Wn.2d at 706. Noting that "it is improper to present evidence that has been deliberately altered in order to influence the jury's deliberations," the court determined that the photographs may have affected the jury's feelings about the need to strictly observe legal principles and the care it must take in determining the defendant's guilt. *Glasmann*, 175 Wn.2d at 706.

Moreover, the modified photographs were inappropriate expressions of the prosecutor's opinion of the defendant's guilt. *Glasmann*, 175 Wn.2d at 706. Because the case law and professional standards make it clear that the prosecutor's conduct—submitting prejudicial and unadmitted evidence to the jury and commenting on the defendant's guilt—was improper and because these standards were available to the prosecutor before trial, the court held that the prosecutor engaged in misconduct. *Glasmann*, 175 Wn.2d at 706-07.

The *Glasmann* court further determined that the misconduct was so pervasive that it could not be cured with a jury instruction. 175 Wn.2d at 707. The court reasoned that "[h]ighly prejudicial images may sway a jury in ways that words cannot." *Glasmann*, 175 Wn.2d at 707. Therefore, it may be difficult to overcome the images with a jury instruction. *Glasmann*, 175 Wn.2d at 707. Additionally, the court held that there was a substantial likelihood that the misconduct affected the verdict. *Glasmann*, 175 Wn.2d at 708. The defendant had produced evidence that he lacked the opportunity and capacity to form the necessary intent to commit the charged crimes, and, absent the misconduct, the jury might have believed the defendant's theory. *Glasmann*, 175 Wn.2d at 708.

14

Here, the State engaged in improper conduct. Like in *Glasmann,* the prosecutor submitted modified photographs to the jury that were not admitted as evidence during the trial. Although some of the pictures included quoted testimony, neither party introduced into evidence a booking photograph of Walker with text written over or underneath it. As in *Glassman,* these deliberately altered photographs may have affected the jury's feelings about strictly observing legal principles. Additionally, the prosecutor in this case improperly expressed their opinion on Walker's guilt by titling many of their slides "DEFENDANT WALKER GUILTY OF PREMEDITATED MURDER" and by writing "GUILTY BEYOND A REASONABLE DOUBT" over Walker's booking photograph. Ex. 243, at 6, 87. As the *Glasmann* court noted, a prosecutor may not use his position as prosecutor to attempt to sway the jury. 175 Wn.2d at 706. Finally, the State appealed to the jury's emotions by showing pictures of the stolen cash and Walker at dinner with his family with prejudicial quotes written across them. The prosecutor had notice before trial through professional standards and case law that this conduct was improper. *See Glasmann,* 175 Wn.2d at 706-07 (citing *American Bar Association Standards for Criminal Justice* and case law from 2006 and earlier stating that it is improper for a prosecutor to express his personal opinion of defendant's guilt); *Reed,* 102 Wn.2d at 147 (holding that the prosecutor committed misconduct by expressing his personal opinion of defendant's guilt). The State's conduct here was clearly improper under *Glasmann.*

But Walker has failed to show that there is a substantial likelihood that the improper conduct affected the jury's verdict. Our Supreme Court has cautioned that reviewing a claim of

prosecutorial misconduct is not a matter of determining whether there is sufficient evidence to convict the defendant. *Glasmann,* 175 Wn.2d at 710. Rather, we must determine whether the misconduct encouraged the jury to base its decision on improper grounds. *Glasmann,* 175 Wn.2d at 711.

Here, not only did the State present overwhelming evidence connecting Walker to the robbery and murder but also this case is distinguishable from cases where the misconduct's context required reversal. Therefore, it is unlikely that the slides affected the jury's decision. The State had overwhelming evidence connecting Walker to the robbery and murder. Evidence linked Walker to Finley, Turpin, and the Buick on the day of the robbery. Before the robbery, several witnesses heard Walker discussing the robbery, including the possibility that a participant would shoot the guard. Williams-Irby, Trevino, and Parrott all testified about Walker's actions after the robbery, including attempting to wipe the prints off the Buick, carrying $20,000 cash, gloating to his family about the robbery, and threatening Trevino.

Additionally, this case is distinguishable from cases where the State's misconduct required reversal because the jury might have believed the defendant's theory of the case if not for the misconduct. In *Reed,* the defendant argued only that he did not have the requisite intent to commit first degree murder. 102 Wn.2d at 147. He presented evidence that he was severely intoxicated at the time of the murder and that he suffered from borderline personality disorders. *Reed,* 102 Wn.2d at 147. In holding that the misconduct required reversal, the court noted that the State's evidence was not overwhelming and the defendant's theory was plausible. *Reed,* 102 Wn.2d at 147. Similarly, in *Glasmann,* the defendant argued only that he did not have the requisite intent and provided evidence supporting his claims that he was intoxicated at the time of the crimes and that he did not have the opportunity to form intent. 175 Wn.2d at 708.

In both cases, the defendants had presented plausible alternative theories supported by evidence. By contrast, here, the State's case was strong and Walker's theory was not nearly as plausible as the defendants' theories in *Reed* and *Glasmann*. Walker argued that the State's evidence was only circumstantial and that its witnesses were not credible. However, circumstantial evidence carries the same weight as direct evidence, *State v. Varga*, 151 Wn.2d 179, 201, 86 P.3d 139 (2004), and much of the witnesses' testimony was corroborated by other witnesses and evidence. Further, the defendants' arguments in *Glasmann* and *Reed* depended on the defendants' credibility, which the prosecutors in both cases attacked. Here, Walker did not take the stand and his credibility was not an issue for the jury. Therefore, although we do not condone the State's misconduct during closing argument, we affirm because the slides did not affect the jury's verdict.

D.    Reasonable Doubt Analogies

Walker next argues that the State's reasonable doubt analogies were misconduct. The State's puzzle and railroad tie analogies were not improper. Although the basketball analogy arguably improperly quantified the level of certainty needed to satisfy the State's burden, it did not affect the verdict.

The prosecutor used three analogies to explain the beyond a reasonable doubt standard.

> Reasonable doubt is not an impossible standard. It is not magic. Imagine, if you will, a jigsaw puzzle of the Tacoma Dome. There will come a time when you are putting that puzzle together, that you will be able to say with some certainty beyond a reasonable doubt what that puzzle is. The Tacoma Dome.

12 RP at 1393.

> You might look at it like this, consider the elements that must be proven— imagine, if you will, a set of railroad tracks in the countryside. You have the two steel rails. Those are like the elements that we have to prove. Underneath that,

supporting those elements, are a whole bunch of railroad ties. Those are like the individual pieces of evidence that you have in this case. . . .

Well, some of the ties, if you will, some piece of evidence might not be that strong in your mind. You might give little weight to certain testimony or pieces of evidence. Still, the State can readily prove its case because the elements, themselves, that which we have to prove are still supported by ample solid evidence. If you take away some of the railroad ties, you still have well-supported rails.

12 RP at 1431-32.

Now, the defense—because this is March Madness basketball season, I will use—forgive me for using a sports analogy, but I'll use a basketball analogy, okay.

. . . .

The defense is going to score a bucket or two on occasion. When the State has scored 40 points to the defendant's 2 points, that doesn't mean that there is a reasonable doubt in the case.

12 RP at 1432-33. Walker did not object to any of these statements at trial.

We review a prosecutor's use of an analogy to explain the beyond a reasonable doubt standard on a case by case basis. *State v. Fuller*, 169 Wn. App. 797, 825, 282 P.3d 126 (2012), *review denied*, 176 Wn.2d 1006, 297 P.3d 68 (2013). We have held that the State's use of an analogy constitutes prosecutorial misconduct where the State either equates its burden of proof to making an everyday choice, or quantifies the level of certainty necessary to satisfy the beyond a reasonable doubt standard. *Fuller*, 169 Wn. App. at 827; *see also State v. Anderson*, 153 Wn. App. 417, 220 P.3d 1273 (2009); *State v. Johnson*, 158 Wn. App. 677, 243 P.3d 936 (2010). But, where the State does not minimize its burden of proof or shift the burden of proof to the defendant by use of a puzzle analogy, such use does not rise to the level of misconduct. *Fuller*, 169 Wn. App. at 826 (citing *State v. Curtiss*, 161 Wn. App. 673, 700-701, 250 P.3d 496, *review denied*, 172 Wn.2d 1012, 259 P.3d 1109 (2011)).

The puzzle example used in this case is nearly identical to the example we held acceptable in *Curtiss*. 161 Wn. App. at 700. In both cases, the examples were "analog[ies] to describe the relationship between circumstantial evidence, direct evidence, and the beyond-a-reasonable-doubt burden of proof." *Curtiss*, 161 Wn. App. at 700. The puzzle analogy did not equate the burden of proof to making an everyday choice or quantify the standard necessary to satisfy its burden. Similarly, the railroad tie analogy did not shift or trivialize the State's burden.

The basketball analogy presents a more difficult question. Arguably, with this analogy, the State improperly quantified the level of certainty needed to satisfy the beyond a reasonable doubt standard. But, even if this statement was improper, as discussed in the preceding section, it did not affect the outcome of the trial.

E.    Urging Jury to Find the Truth

Walker next contends that the prosecutor's statements asking the jury to "decide what the truth is" and telling the jury that "the remedy" is for you to return "true verdicts" were improper. Appellant's Br. at 68, 70. It is improper to ask the jury to declare the truth, but this error may be remedied by a curative instruction. Additionally, it is not improper to ask the jury to return a true verdict.

In its rebuttal, the State told the jury "it is your job to decide what the truth is" and "you have to . . . tell us the truth of what happened by your verdicts." 12 RP at 1435. It also stated, "the peace and dignity of the people of the state of Washington is offended by the crimes that are committed, by the defendant's crimes, the remedy in this public trial is for you to return true verdicts, finding the defendant guilty as charged." 12 RP at 1438-39.

The jury's role is not to determine the truth of what happened; rather, its role is to determine whether the State has proved the charged crimes beyond a reasonable doubt. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). The prosecutor's comments asking the jury to "decide what the truth is" and to "tell us the truth of what happened" suggested an improper role for the jury. 12 RP at 1435. Therefore, the comments were misconduct.

However, Walker fails to show that he was prejudiced by these comments. In *Emery*, the State made similar comments urging the jury to "speak the truth." 174 Wn.2d at 751. The Supreme Court held that these comments were improper but that the defendant failed to show the requisite prejudice. *Emery*, 174 Wn.2d at 760. The court stated that the comments were not inflammatory. *Emery*, 174 Wn.2d at 763. The remarks may have confused the jury, but that confusion could have been cured by a proper instruction. *Emery*, 174 Wn.2d at 764. Because the defendants had to show that the misconduct could not have been cured by an instruction, their argument failed. *Emery*, 174 Wn.2d at 764. The challenged comments were similar in this case to those in *Emery* and the jury was instructed—without objection either at trial or on appeal—about the State's burden of proof; therefore, we follow *Emery* and hold that the misconduct could be corrected by a jury instruction; thus, Walker's argument fails.

Additionally, the prosecutor's statement that the "remedy . . . is for you to return true verdicts" was not improper. 12 RP at 1439. It is improper for the prosecutor to argue that the jury should convict to protect the community or deter future law breaking. *United States v. Solivan*, 937 F.2d 1146, 1153 (6th Cir. 1991) (quoting *United States v. Monaghan*, 741 F.2d 1434, 1441 (D.C. Cir. 1984), *cert. denied*, 470 U.S. 1085, 105 S. Ct. 1847, 85 L. Ed. 2d 146 (1985)). In *State v. Ramos*, Division One of this court held that the State committed misconduct when it asked the jury to convict the defendant to protect the community from drug activities.

20

164 Wn. App. 327, 338, 340, 263 P.3d 1268 (2011). Here, the State did not ask the jury to protect the community or deter future law breaking. Instead, it alleged—as in its charging document—that Walker had committed crimes against the "peace and dignity" of Washington and asked the jury to find him guilty. 12 RP at 1438. Further, we have held that, although it is improper to ask the jury to decide the truth, it is not improper to ask the jury to return a true verdict. *See Curtiss*, 161 Wn. App. at 701 (holding that it is not misconduct to urge the jury to return a just verdict).

F.    Comments about Defense Strategy

Walker next contends that the State committed misconduct when it argued that he was misleading the jury. Because the State's comments were responses to Walker's closing argument, they were not misconduct.

It is improper for the prosecutor to disparagingly comment on defense counsel's role or impugn counsel's integrity. *Thorgerson*, 172 Wn.2d at 451. In *Thorgerson*, the defendant argued that the State committed misconduct when it accused the defense of engaging in "sleight of hand" and used disparaging terms like "bogus" and "desperation." 172 Wn.2d at 451-52. Focusing on the State's use of "bogus" and the "sleight of hand" comment, which the State planned in advance, the court determined that the State engaged in misconduct. *Thorgerson*, 172 Wn.2d at 450, 452. But the court concluded that the misconduct was not prejudicial because it was not likely to have altered the outcome of the case. *Thorgerson*, 172 Wn.2d at 452.

Here, the State's arguments were not misconduct. First, its comments were in response to Walker's closing argument. In his closing argument, Walker urged the jury to have a "healthy distrust for government" because "[t]hey are trying to sell you something." 12 RP at 1398. He then discussed each witness's testimony and attempted to point out weaknesses. He paid

21

particular attention to Williams-Irby's testimony, arguing that it was "bought and paid for" by the State. 12 RP at 1418-19. On rebuttal, the State addressed some of Walker's closing arguments and argued that his characterization of the testimony was misleading and pointed out facts that he had misconstrued. For example, regarding Williams-Irby's testimony, the State said, "The defense stood up here minutes ago and try [sic] to mislead you again into thinking that Ms. Williams-Irby only pled guilty after the ante had been upped, after the charges [had] been increased. That's misleading. That's wrong. What this is, is a desperate attempt to cast doubt." 12 RP at 1427. The State also referred to "desperation by the defense" and "attempts to mislead you" while discussing testimony that Walker misstated during closing argument (i.e., Williams-Irby never said she was present when Walker bought the 9 mm, she was present when he bought the .45; a witness at Walmart never said she saw the Buick's window down, she said she could not remember whether it was down). 12 RP at 1427.

Second, although the State did refer to some of Walker's attempts to characterize witness testimony as "desperate," this was not misconduct. This case is distinguishable from *Thorgerson*. In *Thorgerson*, the State used "desperation" to describe defense counsel's arguments, but this term was combined with other comments that the court found to be clearly disparaging. 172 Wn.2d at 451-52. In fact, the court focused on the other comments in holding that the State committed misconduct. Here, there is no other disparaging language that rises to the level of the language in *Thorgerson*. Additionally, the *Thorgerson* court determined that the State had set up its "sleight of hand" argument during cross examination of the defendant. 172 Wn.2d at 452. Here, there is no indication that the State planned its challenged arguments in advance.

G.    Premeditation Example

Walker next argues that the State misinformed the jury about premeditation. The State's premeditation example was not improper, and, even if it was, it was not likely to affect the jury's verdict on premeditation.

In its closing argument, the State defined premeditation for the jury and then gave the following example: "Just by going to—stopping at a stop sign or a railroad crossing, that is deliberation. You formulate the intent, and then you act." 12 RP at 1376.

Premeditation involves more than a moment in point of time. RCW 9A.32.020(1). It is the "deliberate formation of and reflection upon the intent to take a human life and involves the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short." *Hoffman*, 116 Wn.2d at 82-83.

The State did not misstate the law on premeditation. Although the stop sign example suggested that premeditated intent could be formed in a short period of time, the State still informed the jury that *some* time was required. Before giving its example, the State said, "Premeditation must involve more than a moment of time. The law requires some time, however long or short, in which it [sic] a design to kill is deliberately formed." 12 RP at 1376.

Walker additionally asserts that the stop sign example was inapt because few people deliberate about whether to stop. This mischaracterizes the State's analogy. As the trial court noted, the State was referring to the decision to proceed after stopping at a stop sign and considering whether it is safe to go forward.

Even if the State had misstated the law, any misstatement was cured by the jury instructions. The court properly instructed the jury regarding premeditation, and we presume that the jury follows the trial court's instructions. *State v. Southerland*, 109 Wn.2d 389, 391, 745

23

P.2d 33 (1987). Moreover, there is not a substantial likelihood that the State's premeditation explanation affected the verdict because there was ample evidence of premeditation by both Walker and Finley. Multiple witnesses testified that they heard Walker and Finley discussing the robbery beforehand, including the possibility that someone might shoot the guard. Lewis testified that he actually went to Walmart with Finley and Walker so they could show him how the robbery would take place and that Walker offered him and Finley guns before they entered the store. And, on the day of the actual robbery, Finley entered the store with a loaded gun. *See Ra*, 144 Wn. App. at 703 (listing the planned presence of a weapon at the scene of the crime as one circumstance supporting premeditation).

H.    Cumulative Error

Finally, Walker argues that, if we do not find prejudice in any individual instances of misconduct, we should find that the misconduct, when taken together, violated his rights to a fair trial. We may reverse a defendant's conviction when the combined effect of errors during trial effectively denied the defendant his right to a fair trial, even if each error standing alone would be harmless. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). But, this doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial. *Weber*, 159 Wn.2d at 279. Here, only some of the conduct complained of was clearly error: the PowerPoint slides declaring Walker guilty and the State's comments telling the jury to "decide what the truth is." 12 RP at 1435. As discussed above, the improper slides did not affect the outcome of the case. The added error of the "truth" statements is not enough to establish cumulative error where these statements did not inflame the jury and they were easily remedied by the court's instructions regarding the jury's duties. This argument fails.

41970-0-II

II.  INEFFECTIVE ASSISTANCE OF COUNSEL

Walker next argues that defense counsel was ineffective because counsel failed to request a cautionary instruction for Williams-Irby's testimony and failed to object to multiple instances of prosecutorial misconduct.  Because a cautionary instruction is not necessary where the accomplice's testimony is corroborated by other evidence and because the State's errors were not prejudicial, we disagree.

Under the *Strickland*[3] test, Walker must show that counsel's performance was deficient and that this deficient performance prejudiced him.  *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987).  Performance is deficient only if it "[falls] below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.  Performance is not deficient if counsel's conduct can be characterized as a legitimate trial strategy.  *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009).  To establish prejudice, the defendant must show a reasonable probability that the deficient performance affected the outcome of the trial.  *Thomas*, 109 Wn.2d at 226.

Walker first argues that counsel erred by not requesting a cautionary instruction regarding accomplice Williams-Irby's testimony.  Where the State introduces accomplice testimony, it is the "better practice" to give a cautionary jury instruction.[4] *State v. Harris*, 102 Wn.2d 148, 155, 685 P.2d 584 (1984) *overruled on other grounds by State v. Brown*, 111 Wn.2d 124, 761 P.2d

---

[3] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).
[4] For example, the pattern instruction states:

> Testimony of an accomplice given on behalf of the [State] should be subjected to careful examination in the light of other evidence in the case, and should be acted upon with great caution.  You should not find the defendant guilty upon such testimony alone unless, after carefully considering the testimony, you are satisfied beyond a reasonable doubt of its truth.

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 6.05, at 184 (3d ed. 2008).

25

588 (1988). Failure to give the cautionary instruction is reversible error when the prosecution relies solely on accomplice testimony, but if the accomplice testimony was substantially corroborated by testimonial, documentary, or circumstantial evidence, then the trial court did not commit reversible error by failing to give the instruction. *Harris*, 102 Wn.2d at 155.

Here, counsel was not deficient for failing to request the instruction because Williams-Irby's testimony was substantially corroborated by other evidence. Parrott, Lewis, and Lopez all also testified that they heard Walker planning the robbery beforehand, including the roles each person would play. Parrott and Trevino corroborated Williams-Irby's testimony about the events after the robbery. Other witnesses saw Walker in the Buick in the Walmart parking lot and with Finley and another man after the robbery. There was also evidence that the Buick was parked at Walker's house prior to the robbery, and his fingerprint was found on the driver's seatbelt. Finally, there is video footage of Walker purchasing two safes with cash after the robbery. One of the safes was found in the car Finley was arrested in and the other was found in Walker's house with large amounts of cash in it. Williams-Irby's testimony was substantially corroborated by other testimonial, direct, and circumstantial evidence.

Walker next argues that counsel erred by not objecting to the prosecutor's misconduct. Again, only a few of the prosecutor's remarks and actions were actually errors; counsel was not deficient for failing to object to conduct that was not improper. But the prosecutor did err by giving personal opinions regarding Walker's guilt in the closing argument PowerPoint and by asking the jury to decide the truth, and counsel failed to object to both of these errors. Without providing any authority, Walker states that any failure to object to errors that could be cured by a jury instruction is deficient performance. Assuming this to be true, Walker has still failed to show any prejudice, even under the "somewhat lower" standard of prejudice used for ineffective

26

assistance claims. *Strickland*, 466 U.S. at 694. The trial court correctly instructed the jury regarding its duty in the case; therefore, the State's "truth" comments did not affect the outcome of the trial. Additionally, given the strength of the State's evidence, the prosecutor's closing argument slides did not affect the outcome of the trial. Accordingly, Walker has failed to show that counsel was ineffective.

III.   STATEMENT OF ADDITIONAL GROUNDS

In his SAG, Walker alleges that the evidence found in his safe should have been suppressed and that the trial court erred by denying him a CrR 3.6 hearing. Walker filed a motion to suppress the evidence from the safe on the Friday before the trial was about to begin. The trial court denied his motion for two reasons: (1) the motion was untimely and (2) Walker failed to establish any basis for suppression because the search was pursuant to a warrant and the warrant listed items that could be contained in a safe.

Walker argues that the police cannot search a locked container, citing to cases involving warrantless searches of vehicles and homes. But here, the search involved a house, not a vehicle, and the police possessed a valid search warrant, which Walker does not challenge. Additionally, the warrant included items that could fit in a safe. Because the motion would not have been granted even if the trial court had held a CrR 3.6 hearing, the trial court did not err by denying Walker's motion for a hearing.

IV.   STATE'S CROSS APPEAL

In its cross appeal, the State challenges part of the trial court's aggravating circumstances instruction. The trial court instructed the jury that

> [f]or the aggravating circumstance to apply [to the first degree premeditated murder charge], the defendant must have been a major participant in acts causing the death of Kurt Husted and the aggravating factors must specifically apply to

the defendant's actions. The State has the burden of proving this beyond a reasonable doubt. If you have a reasonable doubt whether the defendant was a major participant, you should answer the special verdict "no."

CP at 250. The State argues that this language was inappropriate because it only applies when the State is seeking the death penalty, which it did not do here. Although the jury found that the State met its burden of proving the aggravating factors in this case, the State asks us to hold that this language is in error and to instruct the trial court to remove this language from the aggravating circumstances instruction in the event of a remand. Because we affirm the trial court, there is no need to remand and no need to consider the State's argument.

Affirmed.

_____
Penoyar, J.

We concur:

_____
Johanson, A.C.J.

_____
Bjorgen, J.

28